IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

ROBERT E. MCLENDON                                                                       PLAINTIFF

V.                                                                  CIVIL ACTION # 2:06cv236-KS-MTP

WAL-MART STORES, INC.
HOME ASSURANCE COMPANY and
CLAIMS MANAGEMENT, INC                                                               DEFENDANT

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on the Defendants' motion for summary judgment [# **38**]. Because the Plaintiff has failed to raise a genuine issue of material fact for any of his claims against the Defendants, the motion for summary judgment should be **granted**.

FACTUAL BACKGROUND

Robert E. McLendon unloaded trucks for Wal-Mart Stores, Inc. ("Wal-Mart") in Columbia. While working a truck in December of 2003, McLendon slipped off a pallet and twisted his knee. McLendon had a history of knee problems, but had not suffered an aggravation for several years. He immediately reported his injury to supervisors and sought medical treatment.

The day McLendon injured his knee, he completed a statement for Wal-Mart claiming that he had never injured that knee before.[1] Two days later, he repeated this claim to Sandra

---

[1] The claims made against Wal-Mart's policy were handled by Claims Management, Inc. ("CMI"). Because CMI processed Mclendon's claim, their conduct is the focus of the Plaintiff's complaint.

1

Ring, a claims adjuster for CMI who handled McLendon's claim for all purposes relevant to this lawsuit. McLendon told Ring that he never had any problems with his left knee, and had never worn a brace or required medical treatment. As medical records later indicated, McLendon had sought treatment for several knee problems, a fact that he concealed from CMI immediately after his accident.

After initially treating him conservatively, McLendon's treating physician Dr. Raymond Whitehead recommended surgery on January 13, 2004. The surgery was not approved by CMI until May 20, 2004, more than four months after it was first recommended. This lawsuit deals with why CMI delayed authorizing that surgery for four months and whether they exercised bad faith in doing so.

After Dr. Whitehead's recommendation, employees for CMI began preparing the necessary paperwork to approve the operation. While gathering this paperwork, Ring learned that McLendon had been treated by his family physician for prior knee problems. At a January 22 meeting scheduled to approve McLendon's surgery, CMI decided to delay approval until medical records for these prior treatments could be obtained from McLendon's family physician.

Ring received the records shortly after the surgery review. They indicated that McLendon had injured his left knee in 2000 and was treated throughout 2001. The injury itself was identical to the current workplace injury, a meniscal tear to the posterior horn. The records also indicated that McLendon had been treated by two other physicians for knee problems at the Hattiesburg Clinic. Ring decided to investigate further to determine whether and to what extent McLendon's current knee injury was pre-existing. She contacted the Hattiesburg Clinic to obtain the remainder of McLendon's known medical records.

After that point, McLendon and CMI were at loggerheads. McLendon revoked his authorization for CMI to obtain his medical records on January 26, 2004. Ring then contacted McLendon, who again claimed that he had no previous knee injuries. Later the same day, he admitted to Ring in a second conversation that in fact, he had injured his left knee before. Ring again attempted to obtain records of this treatment, but it was not until February 12, 2004, that McLendon's attorneys restored authorization and Ring received the paperwork.

The parties hotly contest where to place blame for the ensuing three month delay, stretching from mid-February to the successful surgery in mid-May. Because the prior delays were solely the fault of McLendon in hiding his own medical records, his claim of bad faith against the Defendants must stand or fall on CMI's investigation in the spring of 2004. While the basic facts of that investigation are clear, the attitude and motivation of the parties animate McLendon's claims in this lawsuit.

After the records revealing prior knee injuries were turned over, CMI and Ring wanted to investigate the relationship between McLeondon's prior injury and his current injury to determine what part of McLendon's current condition was compensable. Ring had learned from McLeondon's records that he had declined a recommended surgery after his first injury, and that conservative treatment had made that tear largely asymptomatic. She decided to contact Dr. Whitehead, McLendon's treating physician, and ask a series of questions about whether the need for surgery was pre-existing or was a result of his workplace fall.

Her first letter was sent on February 25, 2005. After some haggling over Dr. Whitehead's fees, Ring received a response to the letter on March 29, 2007. Dr. Whitehead's response did not directly address the question of causation, so Ring wrote a second letter on April 5 asking "is the

incident of December 3, 2003 the major material cause and need for surgical treatment or on a more probable than not basis is the pre-existing medical meniscus tear the primary factor." Whitehead responded on April 7 by saying that McLendon had "successfully rehab[ed] his [prior] medical meniscus tear" but that "he has continued to have activity related pain, popping, and swelling" and "is in need of arthroscopy to treat his internal derangement."

Despite Whitehead's response, Ring pressed on, and on April 19 she sent Dr. Whitehead a third letter asking whether "conservative treatment would place [McLendon] at pre-incident status" and directing Dr. Whitehead to support his opinion with medical evidence. Upon receipt of this letter, Dr. Whitehead attempted to contact Ring by telephone, and Ring advised she could not speak directly with him because McLendon was represented by counsel. After McLendon fired his counsel and advised Ring that he was unrepresented, Ring called Dr. Whitehead's office on May 5 but was unable to locate him. Dr. Whitehead never returned this call or responded to the April 19 letter of Ring. After several conversations between McLendon and Ring, CMI approved surgery for McLendon on May 18, 2007.

The Defendants claim the delay in this investigation came almost exclusively from the failure of McLendon's treating physician Dr. Whitehead to answer direct questions about whether surgery was necessary in light of the prior injury and recovery. The Defendants maintain that prompt and responsive answers from Dr. Whitehead would have resulted in a quicker decision, but that they were still investigating the claim in good faith prior to their decision for approval. They offer no explanation as to why surgery was approved without a final response from Dr. Whitehead, other than a decision to "give [McLendon] the benefit of the doubt."

The Plaintiff looks at the same time frame to paint a much more damaging picture of the

Defendant's claims handling procedures. McLendon claims that Ring's obsession with treatment alternatives was improper and impermissibly delayed his chance for pain relieving surgery. McLendon claims that Ring was not engaging in a real investigation because her inquiries to Dr. Whitehead were consistently opaque, and appeared to shift the decisions of compensability from the insurer to the treating physician. McLendon further claims that Ring manipulated the investigation and was merely "playing games with the physician" and "intentionally acting in a manner calculated to cause delay."

During their investigation, CMI never sought independent medical testing on McLendon to test their theory of whether McLendon was suffering from pre-existing injuries or the workplace injury. CMI also never had a third-party physician review the medical record of McLendon to get another opinion. After mid-February, the entire investigation consisted of inquiries to Dr. Whitehead. Although Dr. Whitehead failed to respond to the final letter, CMI spontaneously approved McLendon's procedure.

On October 17, 2006, McLendon filed suit against Wal-Mart, American Home, and CMI. McLendon alleged that CMI engaged in abusive conduct in delaying the investigation of his claim, failed to abide by the Official Mississippi Uniform Worker's Compensation Fee Schedule ( "Fee Schedule"), and intentionally caused him emotional distress. On September 10, 2007, the Defendants filed the instant motion for summary judgment on all counts.

## STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To support a motion for summary judgment, "the moving party ... [has] the burden of showing the absence of a genuine issue as to any material fact." *Burleson v. Tex. Dept. of Criminal Justice,* 393 F.3d 577, 589 (5th Cir 2004).

If the movant satisfies its initial burden, then the burden shifts back to the nonmoving party to produce evidence indicating that a genuine issue of material fact exists for each essential element of its case. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003). The nonmovant is not entitled to merely rest on her pleadings, but must set forth "specific facts showing there is a genuine issue for trial." *DirecTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). In evaluating a motion for summary judgment, the court views all evidence "in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in its favor." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007).

Mississippi places a duty on insurers to properly investigate the claims of their policyholders. *Pilate v. Amer. Federated Ins. Co.*, 865 So. 2d 387, 395 (Miss. App. 2004). A proper investigation means obtaining "all medical information relevant to a policyholder's claim." *Lewis v. Equity Nat. Life Ins. Co.*, 637 So. 2d 183, 187 (Miss. 1994). At a minimum, the insurer must "make a reasonable effort to secure all medical records relevant to the claim." *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 204 (Miss. 2002) (refusing to overturn judgment against insurer when their employee "attempted to place the burden of submitting information regarding the claim on [the claimant]").

Mississippi law recognizes a claim of bad faith refusal of insurance coverage, and a

corresponding chance to recover punitive damages, if a plaintiff can prove that (1) there was no arguable or legitimate reason to deny coverage and (2) the insurer acted willfully, maliciously, or with gross and reckless disregard for the insured's rights. *Liberty Mutual Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2003). Federal courts have applied *Caldwell* and *Pilate* to hold that when an insurer is actively investigating a case, it has not committed an intentional tort that could support the award of punitive damages. *Washington v. Amer. Her. Life Ins. Co.*, 2007 WL 2159350 at *6 (N.D. Miss. July 25, 2007).

     The award of punitive damages under Mississippi law requires a plaintiff to prove "by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton, or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65. Punitive damages are recoverable in a breach of contract case only "where the breach results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort." *Caldwell*, 686 So. 2d at 1095. If the insurer had an arguable reason to deny coverage, punitive damages are impermissible. *Pioneer Life Ins. Co. of Ill. v. Moss*, 513 So. 2d 927, 929 (Miss. 1987). The Mississippi Supreme Court has defined an "arguable reason" as "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort." *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1096 (Miss. 1996).[2]

---

[2] The Court previously defined an arguable reason as "one in support of which there is some credible evidence. There may well be evidence to the contrary. A person is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he acts." *Blue Cross & Blue Shield of Miss., Inc. v. Campbell*, 466 S. 2d 833, 851 (Miss. 1985).

ANALYSIS

The Plaintiffs first advance the legal argument that CMI had no basis for investigating the prior knee injuries of McLendon because they were irrelevant to CMI's duty to pay. This oversimplifies the applicable rule. The Mississippi Supreme Court held in *Rathborne* that

> when a pre-existing disease or infirmity of an employee is aggravated, lighted up, or accelerated by a work-connected injury, or if the injury combines with the disease or infirmity to produce disability, the resulting disability is compensable. A corollary to the rule just stated is that when the effects of the injury have subsided, and the injury no longer combines with the disease or infirmity to produce disability, any subsequent disability attributable solely to the disease or infirmity is not compensable.
>
> *Rathborne, Hare and Ridgeway Box Co. v. Greene*, 115 So. 2d 674, 676 (Miss. 1959).

If CMI believed that the injury sustained by McLendon was not combining with the prior injuries to disable McLendon, then certain therapy and treatment necessary only because of his pre-existing injury might not be compensable. In other words, there was a valid legal basis for CMI to spend some time investigating the relationship between the Plaintiff's prior injury and his workplace injury.

The Plaintiff next argues that once surgery had been recommended, CMI could only discharge its duty to McLendon by approving the procedure. This again misstates the applicable rule. In *Lloyd*, the Mississippi Supreme Court held that if more conservative treatment could return the worker to his pre-accident condition, then the insurer was not liable for the costs of surgery. *See Lloyd Ford Co. v. Price*, 126 So. 2d 529, 532 (Miss. 1961).[3] As such, CMI had a valid legal basis for spending some time investigating whether conservative treatment would be sufficient to restore McLendon to his pre-accident condition.

---

[3] *See also Pierce v. National Bank of Detroit*, 516 N.W.2d 915, 917 (Mich. 1994).

Even if CMI had some basis to investigate, McLendon further argues that the investigation itself was carried out in bad faith.  He claims that Ring's failure to uncover more pertinent evidence during the investigation supports an inference of bad faith.  But the fact that Ring's further investigation yielded no results does not mean that the investigation itself was carried out improperly.  Prior records indicated that McLendon previously suffered the exact same injury and was able to avoid surgery with conservative treatment.  Ring made several (albeit unsuccessful) attempts to elicit from Dr. Whitehead whether a similar approach would return McLendon to his pre-accident condition.  Dr. Whitehead's careful parsing of those questions was as much a delay as Ring's attempt to get them answered.[4]  After the third set of correspondence, Ring abandoned her effort to get this information from Dr. Whitehead and decided to approve the surgery.  While hindsight reveals the investigation to have been fruitless, it alone does not establish that the investigation proceeded in bad faith.  *See Tarver v. Colonial Life & Acc. Ins. Co.*, 2007 WL 551766 at *8 (S.D. Miss. Feb. 21, 2007) ("Bad faith requires a showing of more than bad judgment or negligence; rather, 'bad faith' implies some conscious wrongdoing 'because of dishonest purpose or moral obliquity.'") (citations omitted).

Based on her prior history with the Plaintiff, it was reasonable for Ring to have some skepticism about how the Plaintiff's workplace claim related to his previous injury.  It was McLendon who misrepresented his prior knee problems in paperwork regarding his injury and in

---

[4]In their memorandum, the Plaintiffs make much ado about the precise wording of Ring's letters to Dr. Whitehead.  They claim that her questions "changed the standard by which the DOCTOR would judge compensability" and that her notes proved she was trying to "inject...yet another new standard...into the claim resolution process" (emphasis in original).  While Ring's questions were not a model of clarity, neither were Dr. Whitehead's responses.  Dr. Whitehead was understandably focused on getting his patient the best care possible for his knee, while Ring was attempting to untangle an issue of causation that might have simply been unknowable and in which Dr. Whitehead had no interest.  A more astute adjuster might have abandoned the effort earlier, but the exercise itself does not rise above mere negligence on the part of Ring.

the initial interview with the Defendant. It was also McLendon who blocked the Defendant from obtaining his medical records in January in an attempt to prevent CMI from investigating the pre-existing condition. Ring had no reason to know whether McLendon was still manipulating the evidence, so the degree of caution exercised on her part was permissible. Because McLendon caused the investigation to be delayed, he cannot premise a claim of bad faith on that delay. *See Sasone v. Liberty Mut. Ins. Co.*, 2006 WL 286779 at *4 (S.D. Miss. Feb. 3, 2006) (collecting cases that "considered a plaintiff's failure to aid an investigation of a claim as a factor weighing against a finding of bad faith."). The Fifth Circuit applied this rule in *Dauro*, when it refused to find bad faith when the insurer: (1) never denied the claim and ultimately paid $10,000 in excess of the policy limits; (2) delayed payment pending receipt of complete medical records; and (3) tendered payment within one month of receiving the records. *Dauro v. Allstate Ins. Co.*, 114 Fed. Appx. 130, 135 (5th Cir. 2004). The appeals court observed that the insured "contributed to the delay in payment by failing to cooperate with [the insurers] investigation." *Id*. at 136.

Outside of the principal bad faith claim, the Plaintiffs maintain that the Fee Schedule mandates that a decision to approve McLendon's surgery should have been made by the Defendant within two days. The Plaintiffs point to § IV(A)(1) of the Utilization Management Guidelines of the Fee Schedule, which states that "review determinations are made within two business days of receipt of the information on a proposed admission or service requiring review determination." The Plaintiffs argue, without limitation, that his provision applies in all instances, and in the instant case required CMI to approve McLendon's claim in mid-February.

Adopting the Plaintiff's application of that provision in this case would eviscerate an insurer's ability to investigate suspect claims. Cases like McLendon's, that involve the

10

aggravation of a prior injury, require some effort to untangle the web of causation and determine precisely what is compensable. Moreover, the initial misrepresentations by McLendon hampered CMI's ability to investigate the claim more efficiently. Once CMI was satisfied that it had received all necessary medical records to approve the claim, they did so within two days. By doing so, they met the UMG guidelines as applied to McLendon's claim.[5]

Likewise, the Plaintiff's claim of intentional infliction of emotional distress is without merit. The Plaintiff has made no showing that CMI's conduct was "malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." *Am. Banker's Ins. Co. v. Wells*, 819 So. 2d 1196, 1208 (Miss. 2001). As other federal district courts have held, "having a legitimate reason to deny coverage negates defendant's claim for intentional infliction of emotional distress." *American States Ins. Co. v. The Estate of Neighbors*, 1996 WL 33370665 at *2 (N.D. Miss. March 13, 1996).

## CONCLUSION

The Plaintiff has failed to show that the Defendants' plodding investigation of his claim rises above mere negligence, and hence cannot survive summary judgment as a claim of bad faith. Moreover, his application of the Fee Schedule is unduly restrictive, and cannot support recovery against the Defendants. Finally, nothing in the record supports his allegations of intentional infliction of emotional distress. In short, because the Plaintiff has failed to raise a

---

[5]The 48 hour time limitation does not begin to run until the "receipt of the necessary information" by the insurer. Based on the Plaintiff's reasoning, a claimant could submit nothing more than a bare request for treatment to place the insurer on an unforgivingly short decision schedule.

genuine issue of material fact, none of his claims against the Defendants can survive summary judgment.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the motion for summary judgment [# **38**] is **granted**.

SO ORDERED AND ADJUDGED on this, the 1st day of November, 2007.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE